Filed 1/26/23  In re A.S. CA2/4

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION FOUR

| | |
|---|---|
| In re A.S. et al., Persons Coming Under the Juvenile Court Law. | B315521<br><br>(Los Angeles County Super. Ct. Nos. 21CCJP03334, 21CCJP03334 A-D ) |
| LOS ANGELES COUNTY DEPARTMENT OF CHILDREN AND FAMILY SERVICES,<br><br>        Plaintiff and Respondent,<br><br>        v.<br><br>JOSE S.,<br><br>        Defendant and Appellant. | |

APPEAL from an order of the Superior Court of Los Angeles County, Linda L. Sun, Judge.  Affirmed.

Neale B. Gold, under appointment by the Court of Appeal, for Defendant and Appellant.

Dawyn Harrison, Acting County Counsel, Kim Nemoy Assistant County Counsel, Kimberly Roura, Deputy County Counsel, for Plaintiff and Respondent.

---

## INTRODUCTION

Jose S. (father) appeals a juvenile court order exercising jurisdiction over four of his children under Welfare and Institutions Code section 300, subdivision (b)(1).[1]  Father and the children's mother (mother) lived in separate parts of the same house.  The children and mother lived in part of the home that mother kept locked, with the windows covered and jammed closed, because mother was attempting to protect herself from father's coercion and ongoing threats of sexual assault.  Father pulled off mother's pants in front of the children, slapped her buttocks, threatened to cut off mother's debit card, and threatened to kill mother's family members.  Father contends this evidence was insufficient to show a risk of harm to the children under section 300, subdivision (b)(1).  We disagree and affirm.

## FACTUAL AND PROCEDURAL BACKGROUND

### A. Detention

On June 28, 2021, mother initiated a family law case seeking custody of and child support for the four youngest children—A., age 9; K., age 7; and twins M. and O., age 3.  She also took the children from the family home and cut off contact with father.  The detention report stated that mother "fears for

---

[1]  All further statutory references are to the Welfare and Institutions Code unless otherwise indicated.

2

her life and the safety of the children.  Father has made death threats to kill maternal family if mother is to leave the home or leave the father.  Mother reported on-going emotional, physical, verbal abuse; and sexual assault."

Father apparently called the Los Angeles County Department of Children and Family Services (DCFS) on June 30, 2021, reporting that mother was neglecting and emotionally abusing the children.[2]  In an interview at the family home on July 7, father told a children's social worker (CSW) that mother had seemed depressed since she gave birth to the twins.  The family lived together on a single property, with mother and the younger children in the front part of the home and father and their 18-year-old child, C., in the back of the home.  Father said that he and mother had not been in a relationship for a year, but they "continue to have sex."

Father said that when mother was home with the children she "had everyone locked up inside" the house, with the windows boarded up so father could not see inside their living quarters.  Father said mother "always wants to be in the dark" and she accused father of doing witchcraft on her.  Mother also changed the locks so father could not get into that part of the home.  Father said that mother locked 18-year-old C. in his room for eight months, and recently she had not taken the younger children out of the home for three months.  He said mother was a good mother who met the children's needs, but she was not affectionate toward them.

Mother had left the home with the children.  Father stated that based on mother's bank card transactions, she was probably

---

[2]    The report does not identify the initial reporter, but the allegations match father's contentions about mother.

with her maternal family in Riverside County; she would not answer his phone calls. Father also said that the Los Angeles Police Department told him that mother was trying to file a harassment report against him. The CSW confirmed with Moreno Valley Police that mother attempted to file a restraining order against father for ongoing verbal and sexual abuse.

C. told the CSW that he feels safe with father and does not trust mother. C. stated that mother's personality had changed, and she kicked him out of the home, prompting C. to go live in the back area with father. C. also stated that mother locked him up in the home, but the CSW observed that the layout of the home made the allegation "not appear to be feasible." C. said he heard mother yell at the younger children, but he had not observed any violence toward them or any domestic violence between father and mother. C. said the police had never been called to the home.

Mother told the CSW that she had left the home in fear for her life. She stated that father is "a manipulator" who tells people that mother is mentally ill. The detention report states, "Mother is begging for help and stated everyone believes father and she just wants to get away from him, 'I don't want to go back to the home, he is a manipulator, a sick person who only wants to use me as a sex slave.' Mother reported she had to lock herself in the home to prevent father to get in [*sic*] as he only wants sex and he is constantly abusing her emotionally." Mother stated that she was unable to go out to the front porch of the house because "father would start pulling her pants down in the presence of the children." She had to start using screwdrivers and knives to jam the windows closed to prevent father from breaking in, because he would "open the window and get in the bed with mother

4

forcefully." She told the CSW, "I was forced to have sexual relations, did he tell you that? Of course he did not tell you that." Mother admitted that she also boarded up the windows to block father from seeing into the home; she said he has cameras in the bathrooms, and watches mother and the children while they shower.

The CSW noted that mother was "hyper concerned for her own safety and the safety of her family." Mother was considering leaving the country, but father had threatened to kill mother's family if she left. Mother said that father put a GPS device on her car "to have control over me and the children." Mother denied locking C. in his room.

The CSW noted in the detention report that father had provided text messages and voicemails from mother to father. In those messages, "Mother is complaining of father cutting off the water from the house, mother [is] demanding father to re-establish water in the home." Mother stated in a voicemail that father cut off water to the house in an attempt to force her to call him. Mother also asked father to turn on the hot water so she could bathe the children.

In an interview with the CSW, A. said she feels safe with mother but not with father. A. said that father "acts nice, innocent and sweet [but] I don't think he is a good people [*sic*] on the inside. Mom is the only one who cares for me . . . ." A. denied any physical abuse or domestic violence, but "reported a lot of yelling between mother and father and reported father uses the F word and other bad words." A. stated that she had been in therapy after saying she wanted to die the previous year, which A. said was only a joke. The CSW found A. credible.

In an interview, K. reported that he "feels safe with mother and when asked if he feels safe with father, K[.] hesitated for a minute and said 'I'm afraid of my dad. He lies and he always gives me bad decisions [*sic*]; I believe my mom, dad screams and mom is telling the truth, my dad is not telling the truth.'" The CSW found K. credible. The CSW noted that all four children appeared healthy, clean, and well groomed, with no signs of abuse or neglect. With the CSW's help, mother and the children were moved to a confidential location.

In a later interview with the CSW, father denied the sexual abuse allegations, stating that all contact with mother was consensual. Father also denied having cameras in the home, and denied making any death threats.

The family had one previous DCFS referral in 2020, around the time mother and father separated. The allegations were deemed inconclusive or unfounded; the investigating CSW found that the issues arose from the parents' separation and did not reflect abuse or neglect toward the children.

The CSW concluded that based on her interviews with the family members, "the conduct of father . . . includes, but is not limited to, terrorizing the family." DCFS recommended that the children be detained from father and released to mother, with monitored visitation for father.

DCFS filed a juvenile dependency petition under section 300, subdivisions (a) and (b)(1), on July 19, 2021. In counts a-1 and b-1, DCFS alleged that mother and father have a history of engaging in violent altercations in the presence of the children, including father threatening to kill mother's family and pulling mother's pants down in front of the children. DCFS noted that mother locked herself inside the home and barricaded the

windows to prevent father's access, and mother "left the home in fear for her life." DCFS alleged that father's violent conduct endangered the children's physical health and safety, and placed the children at risk of serious physical harm.[3]

At the detention hearing on July 22, 2021, the juvenile court detained the children from father, released them to mother, and ordered monitored visitation for father. On July 29, 2021, the court also entered a temporary restraining order protecting mother from father.

## B.    Jurisdiction and disposition

According to the jurisdiction/disposition report, dated August 24, 2021, the children were still living with mother in a confidential location. In an interview with a CSW, A. said that while they were living next to father, "My dad busted the door one time and I was scared, but I am also a good actress. I trust my mom, but not my dad." She also told the CSW, "All the time they would argue, the whole night and we wouldn't sleep." A. said that father threatened mother by saying that if she refused to be with him, he would take away the credit card. A. also indicated that she had something else to say to the CSW, but she did not want to say it out loud. A. agreed to write it down, and wrote, "He would pull my mom's pants and slap her in the butt." A. said she witnessed this one time. A. called father "an evil man."

The CSW interviewed K., who was extremely active and "ha[d] a hard time listening and staying still." The CSW opined that "being unable to spend time outdoors could be affecting the

---

[3]    The petition also included a count b-2 relating to counseling for A. This count was not sustained, and it is not at issue in this appeal.

7

child and his ability to listen and sit still."  K. told the social worker, "my parents would argue," but he would not say more regarding the allegations, stating "I don't know, I am just a kid." K. said he had not had recent contact with father "[b]ecause I don't want to and I can't tell you why."

In her interview, mother "seem[ed] overwhelmed and worried about her living situation."  Mother stated that the domestic violence "wasn't in the presence of my kids. He would try to do something to me when we were alone. I would scream for my adult son for assistance."  Mother said father threatened that if she did not have sex with him, he would cut up her debit card so she could not buy food for the children.  Mother barricaded her part of the house, but "he would open the door forcefully and he would say it was because the kids were locked in with me."  Mother continued, "I would tell him I want nothing to do with him, he doesn't get it, and still doesn't get it to this date."  Mother also said father was watching her all the time, with cameras in the house and a chip that tracked the location of her car.  She further reported that father "said that if I leave to Mexico [he is] going to kill every last family member until he finds my kids."

In his interview, father said the domestic violence allegations were not true.  Father said he never sexually assaulted mother, or entered the home through a window. Father said mother was "living in a phobia, living in the dark, and everything she is accusing me of is a lie."  Father said that if there had been domestic violence, mother would have called the police.  Father repeated the allegations that mother kept the younger children inside the house for months and kept C. locked in his room; father said he reported this to police, but "they did

not do anything about it." Father said that mother and her family did not like him because they were racist. Father offered to leave the family home so mother and the children could live there.

C. stated that when mother and father lived together, "It was terrible, they would always argue." C. denied seeing any physical altercations between mother and father. C. blamed mother for the family problems, stating that she had kicked C. and father out, and "she is ill. She turned rogue on us and threw so much shade at us. . . . Not abusive though." C. criticized other aspects of mother's parenting that were not relevant to the allegations.

The principal from A. and K.'s school stated that while school was being conducted online due to the pandemic, A. was "smart and able to navigate through her work," but K. would fall asleep during class. The principal thought the children needed more support at home, and said, "you can sense there was a lot of chaos at home." The principal thought father seemed more organized, and that mother's lack of organization was affecting the children.

DCFS recommended that the petition be sustained. It also recommended that the children remain with mother, father have monitored visitation, mother receive family maintenance services, and father receive enhancement services.

At the jurisdiction hearing on August 24, 2021, the court received the two DCFS reports as evidence; no additional evidence was presented. The children's counsel asked that count a-1 be dismissed and count b-1 be sustained. Mother's counsel asked that the allegations against mother be dismissed. Father's

counsel asked that the allegations be dismissed for lack of evidence. DCFS asked that the allegations be sustained as pled.

The juvenile court sustained count b-1, and dismissed the remaining counts. The court stated that the evidence supported count b-1 because father threatened to kill mother's family and pulled mother's pants down in front of the children. The court noted that mother had been attempting to protect herself from sexual assault when she barricaded herself and the children in the house, and then moved with the children to a shelter. The court also referenced A.'s statement that father broke open a door, and the evidence that father exerted financial control over mother.

Turning to disposition, after hearing argument from counsel, the court removed the children from father's care, citing father's threats to kill mother's family, his violence in breaking down a door of the house, and the children's statements that they did not feel safe with father. The court released the children to mother; ordered monitored visitation for A. and K. with father with discretion to liberalize after conjoint counseling with the children; ordered unmonitored visitation with M. and O.; and ordered various services for the family. The court also granted mother's request for a permanent restraining order based on its earlier findings, including father's threats to kill mother's family.[4]

Father timely appealed. On September 2, 2022, while this appeal was pending, the juvenile court issued an order allowing the children to return to father's care. The court also held that

---

[4]     The restraining order protected mother from father; the children were not included in the restraining order.

continued jurisdiction over the family was necessary, and ordered continuing family maintenance services.[5]

## DISCUSSION

Father contends the juvenile court's jurisdiction order was not supported by substantial evidence. "'In reviewing a challenge to the sufficiency of the evidence supporting the jurisdictional findings and disposition, we determine if substantial evidence, contradicted or uncontradicted, supports them. "In making this determination, we draw all reasonable inferences from the evidence to support the findings and orders of the dependency court; we review the record in the light most favorable to the court's determinations; and we note that issues of fact and credibility are the province of the trial court."'" (*In re I.J.* (2013) 56 Cal.4th 766, 773.)

Under section 300, subdivision (b)(1), jurisdiction is appropriate when a child "has suffered, or there is a substantial risk that the child will suffer, serious physical harm or illness, as a result of the failure or inability of the child's parent or guardian to adequately supervise or protect the child, . . . or by the willful or negligent failure of the parent or guardian to provide the child with adequate food, clothing, shelter, or medical treatment. . . ."

Here, substantial evidence showed that the children's safety and well-being were impacted by father's threats and coercion. Father himself initiated DCFS contact by complaining that mother had the children locked in the house with boarded up

---

[5] We granted DCFS's request to take judicial notice of the court's September 2 order. Father challenged the juvenile court's disposition order and restraining order in his opening brief on appeal, but states in his reply brief that these issues have been resolved. We therefore only address his jurisdiction argument.

11

windows—which mother was doing to protect herself from father's threats and sexual assaults. Father also showed texts to the social worker in which mother complained that father had cut off the water to the house in an attempt to force mother to call him, and mother said she was unable to bathe the children. Father also threatened to cut off mother's debit card, her source of income for feeding the children. The children, including adult C., told the social worker that mother and father argued a lot, mother reported that father continually attempted to sexually assault her, the children witnessed father pulling mother's pants down in front of them and slapping mother's behind, and A. said she witnessed father break open a door. Moreover, the children and mother had to leave their home and move into a shelter to escape father's threats, while father tracked mother's movements through her debit card and threatened to kill mother's family members until he found his children.

Father's argument relies on minimizing the effects of his threats and actions, stating in his brief that "not every bad relationship warrants government intervention." However, the evidence shows that father's actions impacted the children in multiple ways, including causing them to live in a home with windows and exits blocked closed, while under threat of having their sources of food and water cut off. These threats to the children's safety, even without actual harm, are sufficient to support a finding under section 300, subdivision (b)(1): "'The court need not wait until a child is seriously abused or injured to assume jurisdiction and take the steps necessary to protect the child.'" (*In re I.J., supra*, 56 Cal.4th 766, 773.)

Father also asserts the children never directly witnessed a domestic violence incident, but the evidence does not support this

12

claim. Mother said she could not go near father because he would pull her pants off, A. told the social worker that father would pull mother's pants down and slap her butt, and A. said she was scared when she witnessed father break open the door to get into the family's living area.

Father also argues that previous evidence of domestic violence does not demonstrate a risk of harm to the children, and does not support the finding here because mother and father were no longer living together at the time of the jurisdiction hearing. He compares this case to *In re Daisy H.* (2011) 192 Cal.App.4th 713 (*Daisy H.*) and *In re M.W.* (2015) 238 Cal.App.4th 1444 (*M.W.*), which both held that a single domestic violence incident that occurred years before the jurisdiction hearing was insufficient to sustain an allegation under section 300, subdivision (b)(1). In *Daisy H.*, the court stated, "Physical violence between a child's parents may support the exercise of jurisdiction under subdivision (b) but only if there is evidence that the violence is ongoing or likely to continue and that it directly harmed the child physically or placed the child at risk of physical harm." (*Daisy H., supra*, 192 Cal.App.4th at p. 717.) In that case, "[t]he physical violence between the parents happened at least two, and probably seven, years before the DCFS filed the petition," and "[t]here was no evidence that any of the children were physically exposed to the past violence between their parents and no evidence of any ongoing violence between the parents who are now separated." (*Ibid.*) In *M.W.*, the father and mother had not lived together for months, father was incarcerated, and the only evidence of domestic violence was a single altercation seven years earlier. (*M.W., supra*, 238 Cal.App.4th at p. 1454.)

13

This case is not similar to *Daisy H.* or *M.W.* because father's threats were current and ongoing. Father and mother were living in the same house until days before the case was opened, and when mother tried to escape, father told the social worker he knew mother's location by tracking her debit card transactions. Mother reported that father continued to threaten to track her down and kill her family members. Moreover, on the day of the jurisdiction hearing the juvenile court imposed a restraining order protecting mother from father, indicating that the court determined continued protection was still needed. In addition, mother was living with the children at a shelter at the time of the hearing and there was no suggestion that her finances had been separated from father's, so the threat of financial coercion was ongoing. This was not like *Daisy H.* and *M.W.*, which lacked evidence of ongoing threats.

Father also asserts that because count a-1 was dismissed, count b-1 should have been dismissed as well: "Just like the court was unable to sustain the Department's allegation pursuant to (a), its allegation under subdivision (b), pleaded with identical language, was also not supported." This argument is baseless. Count a-1 was charged under section 300, subdivision (a), which allows for jurisdiction where a child is at risk of harm "inflicted nonaccidentally upon the child by the child's parent or guardian." (§ 300, subd. (a).) Whether the evidence meets the legal requirements to support a finding under subdivision (a) has no bearing on whether that same evidence may support a finding under section 300, subdivision (b)(1).

**DISPOSITION**

The jurisdiction order is affirmed.

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

COLLINS, ACTING P.J.

We concur:

CURREY, J.

SCADUTO, J.*

---

&ast; Judge of the Los Angeles County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.